Filed 6/11/21

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----


| | |
|---|---|
| BARNEY THOMAS WILLIAMS, | C090436 |
| Plaintiff and Appellant, | (Super. Ct. No. 17CV03462) |
| v. | |
| NATIONAL WESTERN LIFE INSURANCE COMPANY, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Butte County, Tamara L. Mosbarger, Judge.  Reversed with directions.

Majors & Fox, Frank J. Fox; Law Offices of Mary A. Lehman and Mary A. Lehman for Plaintiff and Appellant.

Hinshaw & Culbertson, Edward F. Donohue, Peter L. Isola; Davis Wright Tremaine and Spencer Persson for Defendant and Appellant.


1

National Western Life Insurance Company (NWL) appeals from a jury verdict holding the company liable for negligence and elder abuse arising from an NWL annuity sold to Barney Thomas Williams by Victor Pantaleoni, an independent agent. In 2016, Pantaleoni sold a $100,000 NWL annuity to Williams, who had contacted Pantaleoni to revise a living trust after the death of Williams' wife. When Williams returned the annuity to NWL during a 30-day "free look" period, Pantaleoni wrote a letter over Williams' signature for NWL to reissue a new annuity. In 2017, when Williams cancelled the second annuity, NWL charged a $14,949.91 surrender penalty. The jury awarded Williams damages against NWL, including punitive damages, totaling almost $3 million.

We will reverse.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Pretrial Proceedings

In December 2017, Williams filed a complaint alleging claims for elder financial abuse, negligence per se, and breach of fiduciary duty against Pantaleoni.[1] Williams alleged that he contacted American Family Legal Services to update a trust and estate plan after the death of his wife. Williams received a call from Pantaleoni to set up an appointment in Williams' home. Pantaleoni identified himself as a paralegal with the company.

At the meeting in Williams' home, Pantaleoni provided Williams with a business card stating Pantaleoni was a CSA (Certified Senior Advisor) and "Managing Partner and Paralegal" with American Family Legal Services. Pantaleoni obtained Williams' trust

---

[1] Williams also alleged that, in 2015, the California Department of Insurance (DOI) filed an action against Pantaleoni for violations of the Insurance Code prohibiting misrepresentations to a senior regarding annuities. The action was resolved by an order on a stipulation in which Pantaleoni denied the allegations but agreed to a restricted license and payment of a $2,500 fine.

documents and a $360 fee to update them. One week later Pantaleoni returned and obtained Williams' signature on blank documents and a blank check, which Pantaleoni filled in in the amount of $100,000 and used to purchase an annuity from NWL for Williams.

When Pantaleoni delivered the annuity, Williams decided he did not want it and returned it to NWL during a 30-day free look period. Two weeks later Pantaleoni returned with more blank documents for Williams to sign, including documents that retracted the cancellation of the annuity. When the premium was not refunded, Williams sought the assistance of a financial advisor who wrote to NWL to cancel the annuity. Because the 30-day free look period had passed, NWL refunded the premium but charged a surrender penalty.

In February 2018, Pantaleoni answered the complaint.

In May 2018, Williams amended the complaint to add NWL in place of a Doe defendant.

In July 2018, NWL demurred to the complaint. The trial court sustained the demurrer with leave to amend. The court adopted its tentative ruling that (1) the elder abuse cause of action had not alleged facts that NWL knew Pantaleoni's conduct was likely to be harmful to Williams, as required by Welfare and Institutions Code section 15610.310, subdivision (b), and (2) the negligence per se cause of action alleged that a series of Insurance Code provisions were violated but no facts regarding how defendants violated them, including a statutory provision prohibiting misrepresentations of the terms or benefits of a proposed policy where NWL was not alleged to have made misrepresentations to Williams. "Further, the exact duty owed by NWL to Plaintiff is unclear in the pleadings."

In August 2018, Williams filed a first amended complaint. The amended complaint alleged, inter alia, that: (1) NWL knew of the DOI action against Pantaleoni and his restricted license because these were matters of public record; (2) NWL knew that

Pantaleoni had filed bankruptcy three times in the last six years and was still in bankruptcy at the time of the transactions at issue; (3) NWL knew or should have known that Pantaleoni did not have errors and omissions insurance coverage, contrary to NWL policy; (4) NWL knew or should have known that Pantaleoni operated " 'living trust mills' "[2] to gain access to seniors and sell annuity products, which NWL knew was unlawful, and that Pantaleoni was selling insurance products using a company named Sierra Legal Services; (5) NWL knew that Pantaleoni would earn a $9,500 commission from the sale of an annuity based on a 13-year surrender period, which was inappropriate for someone Williams age; and (6) Williams' April 5, 2017 letter instructing NWL to cancel the annuity complained about Pantaleoni's misconduct, but NWL did not investigate or terminate Pantaleoni and charged a surrender penalty of $14,949.91.

In addition, Williams alleged that in April 2016 he sent a mispunctuated, misspelled handwritten note to NWL to return the first annuity, but the handwriting of the letter Pantaleoni forged to complete the application for the second annuity contrasted starkly with the first note, which Williams asserted "was a HUGE red flag of Mr. Pantaleoni's financial abuse of Plaintiff."

In September 2018, NWL demurred to the amended complaint. The trial court overruled the demurrer, stating that (1) as to the elder abuse cause of action, the amended complaint alleged the likelihood of harm to Williams in that (a) his life expectancy was less than the surrender term of the annuity, or (b) NWL possibly had notice of problems with the annuity because it received two notes in different handwriting purportedly from Williams, and (2) as to the negligence per se cause of action, the court took judicial

---

[2]  A " 'living trust mill' " involves "salespeople, posing as experts in estate planning, engage[ing] in the unlawful practice of law, advis[ing] senior citizens to establish a living trust, and to invest in . . . annuities." (*People ex rel. Lockyer v Fremont General Corp.* (2001) 89 Cal.App.4th 1260, 1263.)

4

notice of the DOI's opinion that there was a private right of action under Insurance Code section 785[3] and found that Williams presented "at least one theory" that NWL knew that Pantaleoni was wrongly using a legal services company to sell insurance products.

In November 2018, NWL answered the first amended complaint.

In February 2019, the trial court granted Williams' unopposed motion for leave to file a second amended complaint, which substituted a fraud claim for the breach of fiduciary claim against Pantaleoni.

## B.     The Trial

### 1.     Plaintiff's Case

#### a.     Barney Williams

Williams testified that his wife of 46 years, Barbara, passed away in 2015. Barbara was an ex-bookkeeper who took care of paying the bills. The couple saved on average $3,000 per year.

In February 2016, Williams called the office that had prepared a trust for him, seeking someone to make changes to the trust because of his wife's death. Pantaleoni came to Williams' house. Williams said he wanted to remove his stepdaughter, Merrily Lee, from the trust and give her $25,000 of the trust benefits, with the remainder going to a homeless shelter, the Jesus Center. Williams gave Pantaleoni a check for $360 paid to American Family Legal Services for changes to the trust. Williams signed the check and Pantaleoni filled in the rest, including the words "TRUST UPDATE" on the memo line.

Pantaleoni asked Williams questions about his finances. Williams said that he had approximately $80,000 invested with a broker and $114,000 in the bank, $8,000 in

---

[3] Insurance Code section 785, subdivision (a), provides: "All insurers, brokers, agents, and others engaged in the transaction of insurance owe a prospective insured who is 65 years of age or older, a duty of honesty, good faith, and fair dealing. This duty is in addition to any other duty, whether express or implied, that may exist."

checking and $106,000 in savings. Williams showed Pantaleoni the brokerage and bank statements. Pantaleoni worked on the trust papers and confirmed for Williams that the changes he requested had been made. Williams let Pantaleoni take the trust documents with him when he left.

A week later Pantaleoni came back for another meeting. At Pantaleoni's suggestion, Williams signed a paper to transfer $100,000 from his savings to his checking account and the two of them went to the bank to complete the transfer. Back at Williams' house, Pantaleoni asked for a check. Williams signed a blank check that Pantaleoni filled in. Williams knew the check was to be in the amount of $100,000. Williams did not know what the check was to be used for. Pantaleoni assured Williams his money was safe. Pantaleoni took the check with him and some other blank documents that Williams signed. Williams thought the documents had something to do with the trust. Pantaleoni did not give Williams copies.

The documents Williams signed included an NWL annuity application, a withdrawal benefit rider and a suitability questionnaire. The suitability questionnaire stated that Williams' annual income was $24,000. Williams did not tell Pantaleoni his annual income was $24,000; his actual income was approximately $16,000 per year. A box checked on the questionnaire indicated that Williams' approximate net worth after purchase of the annuity ranged from $50,000 to $99,999, but a blank for his liquid net worth after purchase was filled in with the amount of $120,000. Williams signed and initialed but did not fill out these documents. Williams did not understand what he was signing; he thought it had something to do with the trust. Pantaleoni never told or notified Williams that Pantaleoni was an insurance agent or selling insurance products.

Williams received a bank statement in the middle of the following week. From the statement, Williams learned for the first time that the $100,000 check was made out to an insurance company.

Pantaleoni came back to deliver the annuity and Williams signed a delivery receipt. Williams read on the first page of the policy that he could return the annuity within 30 days. Williams wanted to send the annuity back because there was a 15 percent surrender penalty if the money was withdrawn within the first year, and a bit less each year thereafter for seven years. Williams did not think that in his medical condition he would survive for the surrender period. Williams sent the policy back with a handwritten note that he had received the policy and wanted to return it. The note stated: "I-WITH-LIKE-TO-RETURN-IT." (*Sic*.)

A few days later Williams heard from Pantaleoni, inquiring about the cancelled annuity. Pantaleoni said he had papers for Williams to sign regarding his stepdaughter. Williams suggested Pantaleoni send the papers and he would sign them and send them back. Pantaleoni insisted on visiting Williams. Williams told Pantaleoni he would have to show Williams where to sign because he was sick and "blurry eyed." When Pantaleoni came to the house, Williams signed another annuity application. Williams also signed two letters both stating in handwritten printing that "I HAVE DECIDED TO KEEP MY ANNUITY CONTRACT . . . AND NOT CANCEL IT," and requesting that the annuity be reissued. Besides Williams' signature, none of the handwritten printing on the page was his. When he signed, it was a blank sheet of paper. Williams told Pantaleoni he did not like signing blank papers. Williams thought he was signing papers regarding his stepdaughter. Pantaleoni never delivered a reissued annuity.

Williams waited two months for the return of his money but it did not show up. Williams called NWL's office and was told the value of the annuity was now $88,000, two months after Williams paid $100,000 for it. Williams decided not to cancel the annuity so that the amount of interest would increase and could be applied to the 15 percent surrender penalty. With the help of a neighbor who had a computer, Williams checked online to see if the interest had increased.

Williams sought help to try to get his money back from NWL. He paid $500 to Mark Starr of the investment firm Edward Jones for that purpose. In March 2017, Williams signed a surrender request to NWL directing that the refund check be mailed to Edward Jones.

On April 5, 2017, Starr typed a letter to NWL signed by Williams, which stated: "I am requesting an immediate processing of the surrender request for my annuity . . . . A copy of the surrender request is included with this fax. [¶] Not only was the policy purchased without explanation of what the investment was, but the agent, Victor Pantaleoni, refused to process the policy cancelation during my 30 day free look period. [¶] Since the day I decided to surrender the policy, Mr. Pantaleoni has continually harassed me by phone and in person to keep me from cancelling the policy. His focus is not on what is best for me, but only how his commission will be affected. [¶] My next step will be to file a complaint with the California Department of Insurance unless this request is processed quickly."

In May 2017, NWL sent a check to Edward Jones for the benefit of Williams in the amount of $88,056.64.

On August 28, 2017, Williams and Prescott Cole, an attorney with California Advocates for Nursing Home Reform, wrote to NWL requesting all Williams' annuity policies and related documents, as well as a final balance statement showing surrender charges.

In early September 2017, Juanita Ziebell at NWL responded to the letter from Williams and Cole. Ziebell summarized the events regarding the initial application for the annuity in February 2016, Williams' request for a refund under the free look provision, and the subsequent letter Williams signed stating that he wanted the policy reissued. Ziebell stated: "At the time of your application, your agent, Victor Pantaleoni, provided you with a copy of the Consumer Information and Disclosure Brochure. The brochure provides an overview of the policy's features, benefits, and limitations. This

8

includes free withdrawal options and withdrawal charge rates. The disclosure also states that this annuity is a deferred annuity and a long term investment. I am enclosing a copy of the signature page which you signed which states, in part, 'I have received a copy of this disclosure and I have reviewed it with my agent. I fully understand the disclosure and specific points outlined above.' " The letter concluded with an explanation of the surrender charges, noting that in the second policy year the charge was 14.75 percent and, as of the first anniversary of the policy, Williams had earned $3,300 at a fixed interest rate of 3.30 percent.

On cross-examination by counsel for NWL, Williams confirmed that, when he went to Starr at Edward Jones, Williams did not ask for advice on how to get a $100,000 refund, because 30 days had passed and Williams knew the refund would be about $88,000, due to the surrender penalty. Williams confirmed in deposition testimony read to the jury that he received the September 2017 letter from Ziebell and read it, but accidentally burned it with his wife's papers.

### b. Dr. Stacey Wood

Dr. Stacey Wood, an expert on the susceptibility of elders to undue influence, testified that Williams was significantly susceptible to undue influence by Pantaleoni. On cross-examination by NWL, Dr. Wood confirmed that she was not testifying that undue influence actually occurred.

### c. Victor Pantaleoni

Pantaleoni's business card for his company American Family Legal Services identified him as a "CSA" and "Managing Partner/Paralegal" with the company and included insurance license numbers for California, Arizona, and Nevada.

9

In 2005, 2009 and 2013, NWL appointed Pantaleoni as an agent in Arizona, California and Nevada.[4] Pantaleoni's 2009 and 2013 contracts with NWL stated: "We appoint you to personally procure applications for insurance for us, deliver policies issued by us and provide policyholder services as requested, all subject to our Rate Book and our Rules and Regulations. You are an independent contractor, and this agreement does not establish an employer-employee relationship." The contract further read: "You agree to abide by our Rules and Regulations and the laws and regulations where we are licensed to sell insurance."

Pantaleoni testified that NWL had a right to terminate him if he violated any laws or regulations. NWL never terminated him.

Pantaleoni received compliance bulletins from NWL. As advised by a bulletin on estate planning services, Pantaleoni understood he (1) could not give legal advice if he did not have a law license, (2) should avoid using the sale of a living trust as a pretext to sell insurance or an annuity, (3) had to identify himself as an insurance agent in advertising and when meeting with a customer, and (4) should avoid using professional designations that imply a level of authority or expertise that he did not possess. Pantaleoni admitted that (1) he had a certification as a CSA but lost it, (2) CSA was not a designation approved by DOI, and (3) he was "negligent" in keeping "CSA" on his business card. Pantaleoni understood, as advised by an NWL bulletin, that he should not use business names that misled customers. Pantaleoni testified that he understood that it was unlawful to use pretext interviews to sell annuities, but said he did not know that it is unlawful to use a trust mill to sell an annuity, nor did he understand what constituted a trust mill.

---

[4] In 2007, Pantaleoni's contract was terminated for lack of production.

Pantaleoni testified that he had sold 13 annuities in the 13 years he had been appointed by NWL. He was familiar with NWL's policy that for each annuity he delivered he was required to obtain a delivery receipt from the customer confirming that the policy was received.

Pantaleoni understood that in California the word "insurance" was required to appear on his business card. He agreed he sold insurance, an annuity, to Williams, and admitted he "should have had a different card."

Pantaleoni testified to his understanding that California has special Insurance Code provisions to protect people over 65. The law required that anyone who meets with a senior in the home must deliver a notice in writing 24 hours prior to the meeting. He understood he was required to keep a copy of the notice, but he did not have one for Williams in his file. Pantaleoni testified he had asked NWL and the third party broker he was affiliated with for the notice to Williams but neither had a copy. Pantaleoni understood that a person meeting with a senior must provide a business card with identifying information and an insurance license number. He did not provide that card to Williams because he did not meet with him to sell insurance. Pantaleoni understood that he could not sell a life insurance policy or annuity using a scheme that misrepresented the true status of his contact with a senior.

In 2016, Pantaleoni was the president of American Family Legal Services. In 2013, Pantaleoni surrendered his right for American Family Legal Services to transact intrastate business in California and reactivated it in 2018.

Pantaleoni's contracts with NWL provided that all records and documents associated with NWL transactions were the company's property and open to inspection. Pantaleoni could not recall, since 2016, NWL inspecting his business card, or telling him to put the word "Insurance" on it, remove "CSA," or move the word "Paralegal" away from his insurance license numbers.

In 2013, Pantaleoni provided a certificate of errors and omissions insurance to NWL. Pantaleoni did not carry errors and omissions insurance when he met with Williams in 2016 and admitted he was negligent in not doing so. Pantaleoni also admitted that he was the subject of an enforcement action by DOI in 2015.

In February 2013, Pantaleoni filled out and signed an NWL agent data sheet identifying "Sierra Attorney Services Inc." as agent and Pantaleoni as its principal. The 2013 contract Pantaleoni signed between NWL and Sierra Attorney Services Inc., identified Pantaleoni as general agent, and included his personal guarantee of Sierra Attorney Services Inc.'s obligations to NWL. In May 2013, NWL notified Pantaleoni that his requested name change from "Sierra Attorney Services" to "Victor Scott Pantaleoni" was executed and in effect. In June 2013, Pantaleoni signed an assignment of all compensation received under his contract with NWL to Sierra Attorney Services Inc.

In August 2013, Pantaleoni filed for bankruptcy. Pantaleoni was in bankruptcy proceedings when he dealt with Williams in 2016. The bankruptcy terminated in April 2016.

In February 2016, Pantaleoni received a $9,500 commission from NWL for selling an annuity to Williams.

Pantaleoni received a notice from NWL dated April 7, 2016, stating that Williams had returned the annuity delivered in March 2016. The notice read: "This request will be held for **5 calendar days** from today. If the policy is conserved you must fax written notification from the policy owner to Client Services. This will be confirmed by letter. [¶] *Comments: Please confirm if you are able to conserve. Return contract if you are unable to conserve. Thanks.*"

Pantaleoni contacted NWL. He was told (1) in order to conserve the annuity, to go to see Williams and talk about the benefits of the annuity, and (2) what paperwork

NWL would need to conserve the annuity. The term "conserve" is an insurance term for speaking with a client to see if the client would like to keep a policy.

Pantaleoni called Williams to set up an appointment to talk him about the reasons why he wanted to return the annuity. Williams did not tell Pantaleoni he was sick and would rather that Pantaleoni put the documents in the mail. On April 9, 2016, Pantaleoni visited Williams in his home and gave him the second annuity application to sign. Pantaleoni confirmed that he wrote the handwritten printed letter Williams signed stating his intention to keep the annuity. Pantaleoni denied the letter was blank when Williams signed it.

Five days later, NWL issued a new annuity with the same policy number. Pantaleoni delivered the second annuity. Pantaleoni testified that Williams signed a delivery receipt for the second annuity. Pantaleoni denied that he did not deliver the second annuity so Williams would not have a chance to return it.

On cross-examination by NWL, Pantaleoni testified that he had life insurance agent appointments from multiple insurance carriers. No insurance company had ever asked to review his business card. Every insurance company reviewed the form of Pantaleoni's 24-hour notice letter but no company ever asked to review the 24-hour notice from a specific sale.

Pantaleoni formed Sierra Attorney Services in Nevada to provide paralegal services to attorneys. The name was approved by the Nevada Department of Insurance. Pantaleoni only sold insurance products in California under his own name. The DOI in California required him to use his own name.

Williams wanted an annuity because his stepdaughter was abusing him and he wanted to keep money away from her. Pantaleoni made a recommendation on a solution for Williams to keep the money in his estate and give it to a different beneficiary, because this could not be done in the trust. Williams' trust had a clause that the beneficiary could

13

not be changed by one trustor after the death of the other trustor. A beneficiary assignment in annuity would trump the trust.

Regarding the second annuity application, Pantaleoni testified he called Williams to set up an appointment and Williams agreed. At the appointment, Williams was not sick and did not take his glasses off because his eyes were tearing. They went over why the original application for the annuity was done.

Williams said he cancelled the first annuity because he did not understand it. Pantaleoni talked about why Williams had his assets in a living trust and that a bank account not in the trust would go to probate. They talked about the benefits of the annuity. They talked about the surrender charge and Williams did not say he did not like the surrender provision. Williams asked why he was signing an application again. Pantaleoni explained that NWL required it because there was a change to the income benefit rider to give Williams a better payout in the future.

Pantaleoni handwrote the letter from Williams instructing NWL to reissue the policy, because he does this on the spot in front of the client instead of preparing it beforehand. Something might change at the meeting; the client might have some peculiarity or idiosyncrasy regarding the letter of instruction.

On redirect, Pantaleoni confirmed that his 2013 agent application gave NWL the right to conduct a background check on him. The bankruptcies Pantaleoni filed were a matter of public record, which NWL could have discovered if they conducted a background check in 2013.

### d. Merrily Lee

Merrily Lee, Williams' stepdaughter, testified that she had never physically or financially abused Williams. In August 2015, Lee returned home when she learned her mother was near death. Lee and Williams took care of administering pain medication to Barbara in the last two weeks of her life. After her mother died, Lee stayed on for another week helping Williams with finding marriage, birth and death certificates and

14

sending death certificates to the appropriate people.  To express his appreciation, Williams gave Lee a substantial check.

### e. Ayanna Burns

Ayanna Burns, vice-president of marketing operations at NWL, previously was the manager of the suitability department.

Burns admitted that NWL had not inspected Pantaleoni's records, before or after the April 5, 2017 letter from Williams.

The April 5, 2017 letter came to NWL with a fax cover sheet addressed to the attention of the compliance department.  The compliance department has procedures for investigating California complaints.  NWL did not investigate the April 5, 2017 letter at the time.

Burns admitted that the August 28, 2017 letter was a complaint letter.  Ziebell reviewed the file in responding to the August 28, 2017 letter.  The April 5, 2017 letter was in the file.  Ziebell would have seen in the file that there had been no investigation of the April 5, 2017 letter.

There was no delivery receipt for the second annuity in NWL's file.  NWL believed the policy had been delivered.  There was other activity in the file that made it clear Williams was aware of the second annuity.  NWL procedure required an e-mail reminding the agent that a signed delivery receipt was needed.  There was no such e-mail in the file.  Once a policy is issued, there is an automated process for generating a delivery receipt.  The second annuity was issued with the same policy number as the first policy, so the automated process for delivery receipt reminders did not occur.  If an agent did not provide the signed delivery receipt, a second reminder stated that NWL can charge back the commission.  Pantaleoni's commission was never charged back.

Prior to NWL issuing the first annuity to Williams in 2016, NWL was aware from the DOI's website that there was an enforcement action against Pantaleoni and an order restricting his license.  There was nothing in NWL's file indicating the company had

15

determined what the enforcement action against Pantaleoni in 2015 involved. His license was still active but restricted. NWL looked into whether Pantaleoni was still eligible to write business with a restricted license.

NWL knew from the first annuity application that Williams was 78. On the suitability questionnaire, a box was checked that Williams' approximate liquid net worth after purchase of the annuity ranged from $50,000 to $99,000 but also stated that he had a liquid net worth of $120,000 after purchase. Burns agreed that this was a mistake. The file did not indicate that NWL called Williams to find out what his net worth was. There was no reason to question his liquid net worth. The discrepancy was not that big. Williams could be still be deemed suitable despite this anomaly, based on his other answers on the questionnaire.

Williams' suitability questionnaire stated that his annual income was $24,000. NWL's suitability guidelines state that, if the client's annual income is below $25,000, low income would be a concern if the client does not have adequate liquid assets and emergency savings.

An NWL document setting forth frequently asked questions in a suitability review stated that a person at or nearing age 65 should have liquidity of at least one-and-a-half to two years of expenses liquid in the event of an emergency and an annuity for a person over 65 should make up no more that 60 percent of the client's liquid net worth. Williams had $114,000 of liquidity, then 60 percent of that amount was the largest annuity he should have been sold.

NWL sends a form letter to a client who has decided not to cancel a policy to let the client know the original policy is being conserved. NWL did not send this letter to Williams because a new and different policy was issued that made changes to the original policy.

The fax cover sheet from Starr on April 5, 2017, stated that the letter of instruction and annuity surrender request were provided "to be reviewed by your Compliance

16

department." NWL's California complaint handling procedures required the company to (1) consider all relevant facts in resolving complaints, (2) attempt to resolve oral complaints over the phone and advise clients to make the complaint in writing when it cannot be resolved over the phone, (3) contact the client by phone, e-mail or regular mail to request clarification of any portion of a complaint that is not clearly understood, (4) make notes of communications with the client and agent in the course of the investigation, (5) maintain these records for the time required by statute, and (6) conduct a thorough investigation of the complaint and where an agent denies misconduct take into account whether the agent provided a substantive and believable explanation. NWL did not conduct an investigation in compliance with these procedures. NWL did not treat the April 5, 2017 fax as a complaint.

On cross-examination by NWL, Burns testified that items in the file showed Williams was aware that he had the second annuity policy, including several letters from NWL to Williams, the surrender request, his receipt of a PIN (personal identification number) to access the NWL website for information about the policy, and that Williams had accessed the policy online.

NWL did not send the letter conserving the policy because the letter only goes out for policies that can be conserved. Williams did not conserve the policy. When NWL received Williams' request during the 30-day free look period, NWL cancelled the first annuity and it was null and void. NWL required a new application and letter of instruction signed by Williams to issue a new policy. The letter of instruction was to make sure he understood why his money was not being returned after he cancelled the first policy.

Burns reviewed the suitability application with a box checked that Williams' net worth after purchase of the annuity ranged from $50,000 to $99,000. NWL measured liquidity as at least one-and-a-half to two years of expenses. $99,000 would be almost five times Williams' expenses. The 60 percent rule was not a strict rule. Another factor

17

that affected the suitability analysis was that the annuity had a withdrawal benefit rider giving Williams an annual income of $7,000 for the rest of his life, which would increase his annual income. Sources of income listed on the suitability questionnaire were 10 percent investments, 80 percent pension, and 10 percent social security—all of which were guaranteed sources of income. It was not uncommon for 78 year olds to have the majority of their income from pension and social security.

On redirect, Burns testified NWL did not require agents in California to submit their business cards for approval. NWL knew that in California an insurance agent has to give a business card to a senior. When Burns reviewed Pantaleoni's file, there was no business card in the file. Burns saw documents in his file referring to Sierra Attorney Services. NWL did not determine what business Sierra Attorney Services was in. NWL did a background check on Pantaleoni when he received his first contract. Burns did not know the exact date of that background check. The background check would have included whether Pantaleoni was in bankruptcy.

Burns saw documents in Pantaleoni's agent file indicating he was affiliated with American Family Legal Services. NWL did not determine the nature of that company's business because there was no reason to. There was no document indicating that Pantaleoni worked for American Family Legal Services or that the company had anything to do with the insurance business.

In 2016, NWL did not require agents to have errors and omissions insurance. It is industry practice now but was not in 2016.

NWL did not terminate Pantaleoni or charge back his commission. NWL has not refunded the surrender penalty charged to Williams.

### f. Dr. Aazaz Ul Haq

Dr. Aazaz Ul Haq, an expert witness in forensic geropsychiatry, testified that Williams suffered severe psychological distress as result of his interactions with Pantaleoni and had symptoms of posttraumatic stress disorder (PTSD).

On cross-examination by NWL, Dr. Haq admitted that his written report did not mention PTSD. Dr. Haq agreed that a medical record from Williams' physician at the time of Williams' interaction with Pantaleoni stated under " 'Psychology,' " " 'No depression, no eating disorder, no mental or physical abuse, no anxiety, no stress.' " Dr. Haq testified that this medical record was not an accurate indication of Williams' mental state and reflected the poor quality of medical records prepared for medical insurance purposes.

### g. Reynaldo Perez, Jr.

Excerpts of the deposition of Reynaldo Perez, Jr., NWL's chief legal officer, were read to the jury. Perez testified that NWL did not require agents to submit their business cards for review and approval.

Perez confirmed that Ziebell was involved in handling policy holder complaints in 2016-2017. The April 5, 2017 letter sounded as if it was a complaint about the agent's conduct. If the complaint handling department or whoever received the April 5, 2017 letter thought it was a complaint, they should have followed the requirements of NWL's complaint handling procedures.

Perez stated that NWL did not contract with legal service companies. All NWL contracts were with independent insurance agents, not with legal service providers. NWL had compliance bulletins advising agents to avoid arrangements with legal service providers. NWL did not have a policy or procedure (1) that applied when the company learns that a legal service company is a trust mill, or (2) that screened legal services companies to make sure they are not trust mills. NWL did not take steps to make sure that the company is not doing business with agents selling annuities with trust mills, other than to communicate the prohibition to agents.

If an agent violated a compliance bulletin or engaged in unlawful conduct, NWL had the right to terminate the agent. NWL did not terminate Pantaleoni.

19

### h. Neal Bordenave

Neal David Bordenave, an expert witness on the standard of care in life insurance transactions with elders in California, testified that NWL had guidelines and requirements in compliance bulletins but did not enforce them and had no checks and balances to make sure annuities were being transacted correctly. All insurance companies send out bulletins and expect agents to review them, but marketing or compliance people at insurance companies need to confirm that agents are in compliance with bulletins.

The document Williams wrote returning the first annuity was from someone with marginal literacy, which should have voided the annuity, but NWL asked Pantaleoni to conserve the annuity and a week later NWL issued another $100,000 annuity with the same policy number. The suitability questionnaire did not reconcile which should have been a red flag for NWL to investigate further. The annuity of $100,000 was 85 to almost 90 percent of Williams' liquid assets, which did not meet a reasonable suitability standard. The April 5, 2017 letter from Starr was effectively a complaint about Pantaleoni indicating a need to investigate the incompleteness of the file and NWL should have immediately offered to pay Williams' money back.

Bordenave disagreed with NWL's expert, Larry Nevonen, that Pantaleoni was a broker, stating that in California to transact life insurance or annuities Pantaleoni had to be an agent of NWL.[5]

On cross-examination by NWL, Bordenave confirmed that he was testifying that NWL's overall supervision of Pantaleoni was insufficient. Bordenave stated that

---

[5] Bordenave also testified that Pantaleoni breached the standard of care: (1) he offered to do trust work as a way to sell insurance in violation of the Insurance Code; (2) he had Williams sign a blank check; (3) Williams apparently did not know he was buying an annuity; (4) Pantaleoni was illegally charging fees for trust work and getting a commission on an insurance transaction at the same time; (5) Pantaleoni may not have delivered the second annuity to Williams; and (6) Pantaleoni did not provide the required 24-hour notice acknowledged by the customer for sales to a person over 65.

insurance companies have a responsibility to monitor their agents to make sure they are doing the right thing. Failing to monitor agents falls below reasonable custom and practice in the insurance industry. Insurance companies need to monitor agents because they are the company's agents.

Bordenave agreed that there was nothing in NWL's file to put the company on notice that Williams was complaining that he wanted a trust but got an annuity.

2. NWL's Case

a. Larry Nevonen

Nevonen, an insurance industry expert, testified that the name "Sierra Attorney Services" in the agent's file did not give rise to duty to inquire what the name meant. The name was authorized by the Nevada Department of Insurance. Sierra Attorney Services received an assignment of commissions but never transacted insurance in California under that name. A legal name in Nevada would not be a red flag for illegal activity in another state.

The card Pantaleoni gave Williams improperly mixed insurance business with living trust and paralegal services business. The card should not have had a CSA designation that was expired and not recognized in California. Nothing on the card referred to NWL that would trigger review by NWL.

NWL's compliance manuals were consistent with industry practice. Pantaleoni's conduct did not constitute a trust mill because it was not a repetitive practice. "The classic trust mill situation is senior seminars for trust services and everybody walks out with an annuity." Pantaleoni met with Williams not to sell an annuity but on learning his situation thought he might benefit from an annuity.

Nevonen was not surprised that the NWL annuity had a 13-year surrender period. Actuaries require higher surrender charges in the early years of annuity because of the financial risk to the insurance company that comes from early surrenders.

21

In doing a suitability review, NWL did not see Pantaleoni's bad acts. NWL assumed the suitability questionnaire was accurate. The contractual responsibility of the agent was to ask questions of the applicant and accurately record the answers in the application. For a senior, the particular focus is on liquid assets available after purchase of the annuity, so that if there is a change in the annuitant's expenses the annuity does not have to be surrendered. The application answered this question by stating Williams had $120,000 in liquid assets. There were inconsistences in the questionnaire but it did not have to be entirely consistent. The questionnaire need only show a reasonable basis to determine there to be enough liquidity to avoid early surrender from a change of circumstances.

In forming his suitability opinion, Nevonen considered the product sold. NWL's guaranteed benefit withdrawal rider had a good reputation in the industry for being liberal and favorable to buyers, which made it a good choice for people who want to improve their income and still have surrender value. The second NWL annuity sold to Williams had a guaranteed withdrawal benefit rider which would generate $7,200 annual income and also allowed him to withdraw 50 percent in 10 percent increments over time. This was a more liberal benefit than the first annuity.

Nevonen disagreed with Bordenave's opinion that NWL was required to supply and obtain a copy of the 24-hour notice. The notice was the agent's responsibility. The agent does the meeting and is required to keep a copy of the notice for seven years, even where no sale results. The custom and practice was for insurance companies to make agents aware of the requirement.

There is no requirement that an insurance company's name be on an agent's card presented to a senior. An agent might be offering several companies' products.

The letter cancelling the first annuity voided the policy. It is fairly common for people to change their minds about a policy. The change from the first annuity to the second annuity made objective sense since the withdrawal benefit rider increased the

22

payout. The $100,000 should have been sent back promptly unless there was a written direction from the buyer that he wanted a different policy. The notice to Pantaleoni that he had five days to preserve the business was not just to preserve the business but was also a heads up to check in with the client. Often a different agent will offer a customer an annuity during the 30-day free look period, describing it as a better deal. The first agent will not know what has happened, and the insurance company only will know the annuity was surrendered.

Nevonen disagreed with negative comments about the handwritten letter instructing NWL to keep the policy. Agents meeting with people do not have computers. A handwritten note is more likely to be performed with the knowledge and consent of the applicant than a typed letter. The fact that the note was handwritten was a positive indication that it represented Williams' actual decision.

The April 5, 2017 letter from Starr was a mixed and unclear request for service to process surrender of the policy combined with complaint language. Nevonen was not surprised the letter went to the service department instead of the compliance department because the letter opened and closed with a request for service. Williams did not put NWL on notice of a problem that needed to be addressed. Williams did not complain at the time about Pantaleoni's selling practices because he liked the interest in the annuity. Starr handled the surrender properly but mishandled the complaint.

The Ziebell letter was responsive to the demand letter from Cole based on her reading of the file. There was no documentation that Williams was demanding an investigation of Pantaleoni or return of surrender charges.

### b. Juanita Statler Ziebell

Beginning in March 2015, Ziebell was in the compliance department at NWL.

The August 28, 2017 letter from Cole and Williams was a request for copies of documents. Ziebell had received a request for documents but did not have a specific complaint, so she was generally looking at the file. Since the April 5, 2017 letter was

23

also in the file, in Ziebell's opinion the August 28, 2017 letter was a complaint. Ziebell testified that it sometimes happens that an initial expression of dissatisfaction is followed by a letter from an attorney.

In handling the complaint in 2017, Ziebell reviewed the initial annuity application. All of the documents in the file appeared to be properly signed. The signature was distinctive. The check was in the file. It did not look suspicious or forged. It did not occur to Ziebell that the check might be filled out after it was signed. Ziebell went by the signature on the first application and from that point was looking for consistencies or inconsistencies in signatures.

The April 5, 2017 letter in the file contained complaint language. Ziebell did not form the impression from the letter that the policy holder did not know they owned the policy at the time the letter was written. The letter requested surrender of the annuity and NWL did that for Williams. Ziebell did not believe the agent had successfully interfered with the initial cancellation because Williams cancelled the policy himself. Both the initial cancellation and surrender of the second policy were effectuated successfully. Ziebell believed Williams had requested the second policy and wanted to surrender it because the policy had been in force for a year.

Ziebell provided some narrative in her letter response because, when an annuity has been surrendered, it was her standard practice to point out the benefits of the annuity. Ziebell sent the requested documents by Federal Express.

Ziebell testified that mostly NWL receives a letter stating a specific complaint. Ziebell responded to the August 28, 2017 letter with some narrative instead of just sending the requested documents, because NWL tries to explain the benefits of the annuity to the client, which sometimes helps the client to reply. NWL sets the matter for a follow-up in the system if there is a reply to get more information. The system has a 30-day review set up automatically. Ziebell will look at the file to see if there is a

24

response from the client and then NWL gives it another 30 days. That would have happened twice after Ziebell wrote her letter.

This file was unusual because most of the time she would get a reply with more details about the grievance. Ziebell was hoping for a reply explaining the nature of the grievance. Ziebell's letter gave a telephone number to contact Ziebell or the NWL client services department with any further questions. More often than not the client will call the number. Ziebell was not trying to resolve the entire complaint process with her letter, but rather to make a record of what she saw in the file so Williams could address it.

In reviewing the file, Ziebell saw there was a blank delivery receipt. It did not cross her mind that Williams did not receive the policy, because he had surrendered it. Applicants also received a welcome letter with an offer for a PIN and an interest letter on the anniversary of the policy.

On cross-examination by Pantaleoni, Ziebell testified she retained the April 5, 2017 letter from Starr in the file, but did not reach out to Williams to address it because the annuity had already been surrendered.

On cross-examination by Williams, Ziebell confirmed that she was following the specific procedures for complaints from California in April 2017 and would do an investigation in response to a complaint. She admitted that the compliance department did not review the April 5, 2017 letter at the time or contact Williams to request documentation. The April 5, 2017 letter did not go to the compliance department but to the surrender department. Surrender was a priority.

c.      **Diamantina Courson**

Diamantina Courson, currently the highest ranking person in licensing at NWL, testified to the basic functions and procedures of the licensing department. NWL operates in 49 states and Puerto Rico, Guam and the Virgin Islands. NWL has about 20,000 agents.

On cross-examination by Williams, Courson testified that the legal department makes the decision to terminate an agent for misconduct or unlawful conduct. Licensing staff are not trained to look for agent complaints. If there is a complaint, it goes to the complaint department. Licensing would want to know if an agent was in trouble or had done something unlawful, but would not get the information unless it was sent to licensing. A report goes to licensing where information is received by compliance.

Courson testified that NWL procedure is to do a background check when newly contracting with the agent. The background check would not include looking for a bankruptcy. NWL would have run a background check on Pantaleoni when he first appointed in 2005. NWL did not run a background check on Pantaleoni at the time of his new contract in 2013.

In January 2016, when NWL learned that Pantaleoni had been the subject of enforcement action and had been placed on a restricted license, NWL would go to DOI to check to see if the license was active and what the enforcement notice concerned. DOI would tell NWL if the enforcement action had been resolved. DOI would give background information from the enforcement documents only if NWL asked for it. Courson did know if NWL had asked for this information.

### d.    Ayanna Burns

On defense for NWL, Burns testified that she reviewed the annuity transaction with Williams for conformity with company policies and standards on suitability and it appeared to be suitable based on the documents the company received. There were no signs that Williams' signature was forged or other red flags as to suitability. The answers provided in the suitability questionnaire and other documents looked in line for Williams' age, what he was looking for, and the additional benefits he was receiving.

On cross-examination by Williams, Burns confirmed that NWL uses a score sheet to document and determine suitability. A score equal to or greater than 10 would require documentation by the suitability reviewer as to why the product is still deemed suitable.

26

NWL did not have the score sheet for Williams because it was changing systems and the results were loaded into the new system. There was no need to keep the actual score sheet.

On redirect, Burns testified that the total suitability score for Williams was 6.2 percent. NWL's suitability reviewer or a coder entered information from the suitability questionnaire into an Excel spreadsheet, which generated a score and the information was uploaded into NWL's system. The suitability reviewer looked at the information, the suitability questionnaire, and other documents to make sure the reviewer felt the product was suitable, and entered comments in the system. In user notes, the reviewer, Jennifer Burgess, identified a yellow flag for annual income because it was below $25,000. The reviewer noted that Williams' expenses were covered and he had more than five years of liquidity. It looked like Williams had plenty of liquidity based on the information provided.

## C. Motion for Nonsuit

At the close of Williams' evidence, NWL filed a motion for nonsuit. The court denied the motion finding that "there has been substantial evidence presented during plaintiff's case in chief supporting judgment on all causes of action for the plaintiff."

## D. Jury Verdicts and Judgment

The jury found NWL liable for elder abuse awarding Williams $14,949.41 in damages for economic loss, $200,000 in noneconomic damages for past pain and suffering, and $150,000 for future pain and suffering, totaling $364,949.41. The jury further determined the Williams had proved by clear and convincing evidence that NWL acted with recklessness, malice, oppression or fraud.

The jury also found Pantaleoni liable for elder abuse and that Williams proved Pantaleoni acted with recklessness, malice, oppression or fraud, awarding total money damages of $168,309.41 on this claim.

The jury found both NWL and Pantaleoni liable for negligence, awarding Williams total money damages of $618,309.41 and allocating 30 percent to Pantaleoni and 70 percent to NWL. The jury further found Pantaleoni liable for intentional misrepresentation and awarded $200,000 in total damages.

The jury awarded punitive damages of $1,000 against Pantaleoni and $2,500,000 against NWL.[6]

In entering judgment, the trial court found that noneconomic damages awarded in the verdict for negligence overlapped with the elder abuse award. To avoid double recovery, the court limited noneconomic damages to $600,000 allocating 70 percent ($420,000) to NWL and 30 percent ($180,000) to Pantaleoni.

The court entered judgment for Williams in the amount of (1) $14,949.41 against Pantaleoni and NWL, jointly and severally, (2) $2,920,000 against NWL, and (3) $186,050.59 against Pantaleoni.

### E.     Post-trial Proceedings

NWL filed motions for judgment notwithstanding the verdict and for a new trial, arguing, inter alia, that Pantaleoni was not NWL's agent in the transactions with Williams.

The trial court denied the motions.

## II.     DISCUSSION

### A.     Negligence

"The elements of a negligence cause of action are the existence of a legal duty of care, breach of that duty, and proximate cause resulting in injury." (*Tindell v. Murphy* (2018) 22 Cal.App.5th 1239, 1252.) " 'Recovery in a negligence action depends as a threshold matter on whether the defendant has " 'a duty to use due care toward an interest

---

[6] Regarding punitive damages, the parties stipulated that NWL had $1.4 billion in assets and Pantaleoni was able to pay $1,000 in punitive damages.

28

of [the plaintiff's] that enjoys legal protection against unintentional invasion.' " ' [Citation.] 'Whether a duty of care exists is a question of law to be determined on a case-by-case basis.' [Citation.]" (*Weimer v. Nationstar Mortgage, LLC* (2020) 47 Cal.App.5th 341, 355-356, review granted July 22, 2020, S262024.)

Any duty owed by NWL to Williams was affected by Pantaleoni's status as an independent agent. The evidence was undisputed that Pantaleoni was an independent agent selling annuities for multiple insurance companies. The DOI website from January 2016 states that Pantaleoni is authorized to transact business on behalf of at least 15 life insurance companies including NWL. Pantaleoni's NWL contract specified that Pantaleoni was "an independent contractor" and not an NWL employee.

"If an insurance agent is the agent for several companies and selects the company with which to place the insurance or insures with one of them according to directions, the insurance agent is the agent of the insured." (*Eddy v. Sharp* (1988) 199 Cal.App.3d 858, 865 (*Eddy*); see also *Mercury Ins. Co. v. Pearson* (2008) 169 Cal.App.4th 1064, 1073 (*Mercury*) [any fraud by an independent agent is committed in the agent's capacity as an agent for the insured].)

Pantaleoni had no authority to bind NWL; he was appointed to procure applications for NWL and deliver policies. Thus, he was akin to an insurance broker rather than insurance agent. (*Marsh & McLennan of Cal., Inc. v. City of Los Angeles* (1976) 62 Cal.App.3d 108, 118 (*Marsh*).) " ' "[I]nsurance agent" means a person authorized, by or on behalf of an insurer, to transact insurance' (Ins. Code, § 31), while ' "insurance broker" means a person who, for compensation and on behalf of another person, transacts insurance other than life *with, but not on behalf of, an insurer.*' (Ins. Code, § 33; italics added.)" (*Id.* at p. 117.) "An independent insurance broker is not an agent of the insurer, but rather is the agent of the insured. [Citations.]" (*Ibid.*; see also *Mark Tanner Construction, Inc. v. HUB Internat. Ins. Services, Inc.* (2014) 224 Cal.App.4th 574, 584; *Century Surety Co. v. Crosby Insurance, Inc.* (2004)

29

124 Cal.App.4th 116, 125.) "The most definitive characteristic of an insurance agent is his authority to bind his principal, the insurer; an insurance broker has no such authority." (*Marsh, supra*, at p. 117.) "While we note many similarities in the services performed and the monetary functions of agents and brokers, there is a more fundamental legal distinction between insurance agents and brokers. Put quite simply, insurance brokers, with no binding authority, are not agents of insurance companies, but are rather independent contractors . . . ." (*Id.* at p. 118; *Century, supra*, at p. 125.)

Williams counters that the court in *Loehr v. Great Republic Ins. Co.* (1990) 226 Cal.App.3d 727 (*Loehr*), "rejected [the insurer's] argument that an agent who represents multiple insurance companies is the insured's agent, NWL's argument here." In *Loehr*, the court observed that an agent is not limited in the number of agency appointments and "thus, an agent may solicit business on behalf of a variety of different insurance carriers, and still technically be an agent of each of those carriers." (*Id.* at p. 733.) The court concluded the trial court erred in instructing the jury to determine whether an independent agent was the insurer's agent or the insureds', and in the latter case, that the agent's acts or omissions were legally those of the insured. (*Ibid.*) The court reasoned that the mere fact that the agent "was an 'independent' insurance agent so licensed to transact insurance business for several different carriers did not insulate [the insurer] from responsibility for [the agent's] actions as its agent, or make [the insured] liable therefor." (*Id.* at p. 734.) The court found the evidence in the record established that the agent was the insurance company's agent. (*Ibid.*) That evidence included a booklet describing the insurer's health plan, which referred insureds with questions to the agent as a " 'trained professional in this field' " and declared that " 'you will find our agents and company personnel expert at their jobs and they will be responsive to your individual needs.' " (*Id.* at p. 729.)

No equivalent evidence exists in this case. To the contrary, as discussed Pantaleoni's contract specified that he was an "independent contractor" and not an NWL

employee. We do not view *Loehr* as stating the broad proposition, contrary to *Eddy*, that an independent agent appointed by multiple carriers is without more the agent of each carrier.

Since Pantaleoni was an independent contractor and agent for Williams in the purchase of an annuity, NWL had no duty to supervise Pantaleoni. (*Abbit v. ING USA Annuity & Life Insurance Co.* (S.D. Cal. 2017) 252 F.Supp.3d 999, 1030-1031 [dismissing failure to supervise claim against insurance company regarding an " 'independent' " agent who sold annuity products from " 'around ten' " companies], citing *Marsh, supra*, 62 Cal.App.3d at p. 118.) Yet much of the claimed negligent conduct that Williams attributed to NWL amounted to insufficient supervision of Pantaleoni, including failure to review his business card, verify that he maintained errors and omissions insurance, prohibit his using a legal services company to sell insurance, conducting periodic background checks which would have disclosed Pantaleoni's bankruptcy, failing to investigate the DOI enforcement action that resulted in his restricted license, and enforcing NWL's compliance bulletins. Bordenave, Williams' expert witness on the standard of care for sales of annuities to seniors, testified, as he acknowledged, that NWL's supervision of Pantaleoni was insufficient and an insurance company has a duty to monitor any appointed agent.[7]

In fact, Williams does not attempt to establish a duty of care on the part of NWL, but rather argues that his "negligence claim against NWL was based, in part, upon the statutory duty of honesty, good faith and fair dealing which NWL owed him, as a matter of law," which Williams derived from Insurance Code section 785, subdivision (a). Williams cites no authority that Insurance Code section 785, subdivision (a), creates a duty of care sufficient to support a negligence claim. Moreover, no California case has

---

[7] If a duty to supervise and monitor independent agents existed, with some 20,000 agents, the expense to NWL would likely impact the cost of annuities offered.

found that the statute creates a private right of action and multiple federal courts in California concluded it does not. (*In re Nat. Western Life Ins. Deferred Annuities* (S.D.Cal. 2006) 467 F.Supp.2d 1071, 1088; *Abbit v. ING USA Annuity & Life Ins. Co.* (S.D.Cal. 2014) 999 F.Supp.2d 1189, 1198; *Parducci v. Overland Solutions, Inc.* (N.D.Cal. 2019) 399 F.Supp.3d 969, 979; see also *Mahan v. Charles W. Chan Ins. Agency, Inc.* (2017) 14 Cal.App.5th 841, 868, fn. 27 (*Mahan*) [declining to take judicial notice of the DOI's opinion on Ins. Code, § 785 and address on appeal whether the statute creates a private cause of action].)

Williams turns to the suitability requirements of Insurance Code section 10509.914, subdivision (c), for sales of annuities—which provides in relevant part that "an insurer shall not issue an annuity recommended to a consumer unless there is a reasonable basis to believe the annuity is suitable based on the consumer's suitability information." "Suitability information" includes the consumer's "Liquidity needs" and "Liquid net worth." (Ins. Code, § 10509.913, subd. (i)(9), (10).) Again, Williams cites no authority basing a duty of care for purposes of a negligence claim on a violation of Insurance Code section 10509.914, subdivision (c). Moreover, NWL's source of suitability information was the suitability questionnaire that accompanied the application. Thus, the principle applies that " 'an insurer has the right to rely on the insured's answers to questions in the insurance application without verifying their accuracy.' " (*LA Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co.* (2007) 156 Cal.App.4th 1259, 1271 (*LA Sound*), quoting *Mitchell v. United National Ins. Co.* (2005) 127 Cal.App.4th 457, 477 (*Mitchell*).)

Williams points to inconsistencies in the suitability questionnaire as raising "questions not only about the suitability of the annuity but also the reliability of other answers on the questionnaire." The evidence at trial was that there was discrepancy between a box checked on the questionnaire indicating that post-purchase Williams' liquidity ranged between $50,000 and $99,000 while a blank for post-purchase liquid net

32

worth was filled in with the amount of $120,000.  As Burns testified, this discrepancy was not that great, and her testimony was undisputed that the questionnaire indicated that $99,000 was five times Williams' liquidity needs.  Williams argues that, based on inconsistencies in the questionnaire, had NWL called him it would have discovered he had a much lower post-purchase liquidity amount.  However, NWL had no duty to conduct a follow-up investigation to determine if there were facts that did not appear, or were different from facts that did appear, on the suitability questionnaire.  (*LA Sound, supra*, 156 Cal.App.4th at p. 1271; *Mitchell, supra*, 127 Cal.App.4th at p. 477.)  The suitability statutes for sales of annuities do not furnish a duty of care for purposes of a negligence claim.

Lastly, Williams argues that NWL breached the duty to investigate his complaint about Pantaleoni.[8]  Williams does not cite any authority where an insurance company was held liable in a negligence for breach of the duty of care in failing to investigate an insured's complaint about an independent agent.  This allegation sounds in negligent supervision and, as discussed, NWL had no duty to supervise and monitor Pantaleoni for misconduct.  Further, Williams bases this negligence theory not on a principle of law but on policies NWL adopted as the result of a settlement agreement in 2010 with the California Insurance Commissioner entered into in conjunction with a class action settlement agreement.  In the settlement agreement, the commissioner's allegations against NWL were denied in detail and the parties agreed the settlement did not constitute an admission of the truth of any allegation or any fault or liability on the part of NWL.  In

---

[8]  Williams contends that NWL admitted it had a duty to investigate his complaint. However, Williams concedes that the record discloses only that legal counsel for NWL made a statement to that effect in opening argument.  "It is elementary statements of the attorneys are not evidence."  (*Van de Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 843; *Biron v. City of Redding* (2014) 225 Cal.App.4th 1264, 1269, fn. 1["Of course, the statement of an attorney is not evidence"].)

agreeing to sales and marketing reforms, including complaint referral practices reforms, NWL did not admit its current practices were in any way improper or unlawful under any applicable law.

A settlement agreement may be enforced by the parties who signed it. (See Code Civ. Proc., § 664.6.) But Williams has cited no authority that a third party may enforce the terms of a settlement agreement via an action for negligence. To the extent that Williams deems himself a third party beneficiary of the agreement as a member of the class of persons for whose benefit it was made, his recourse, if any, was an action to enforce the agreement. (See *Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1299; *General Motors Corp. v. Superior Court* (1993) 12 Cal.App.4th 435, 443-444.)

Separately, the parties debate whether NWL was vicariously liable for Pantaleoni's conduct. An insurer, as principal, may be liable for the torts of its agent if the insurer directed or authorized its agent to perform the tortious acts or ratified acts it did not originally authorize. (*Rios v. Scottsdale Ins. Co.* (2004) 119 Cal.App.4th 1020, 1027.) However, we have concluded that Pantaleoni was not NWL's agent as a matter of law. Therefore, Williams cannot state a viable claim for vicarious liability. (*Mercury, supra*, 169 Cal.App.4th at pp. 1072-1073.)

Having failed to establish a legal duty of care on the part of NWL, Williams cannot maintain an action for negligence or vicarious liability against NWL and the verdict and judgment on this claim must be reversed.

**B.     Elder Abuse**

NWL contends it did not financially abuse Williams within the meaning of the elder abuse statute. Williams counters that substantial evidence supports the jury's finding that NWL was directly liable to Williams for financial abuse. We agree with NWL. The evidence of elder financial abuse Williams presented does not fall within the scope of the statute. To conclude otherwise would transform every dispute between a

34

person over 65 regarding the conduct of an independent agent into an elder abuse action against an insurer.

Elder financial abuse "occurs when a person or entity does any of the following: [¶] (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both. [¶] (2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both. [¶] (3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence, as defined in section 15610.70." (Welf. & Inst. Code, § 15610.30, subd. (a); *Mahan, supra*, 14 Cal.App.5th at p. 856.)

We conclude there was no evidence of "wrongful use" on the part of NWL within the meaning of elder financial abuse statute, which defines "wrongful use" as taking property of an elder by one who "knew or should have known that this conduct is likely to be harmful to the elder or dependent adult." (Welf. & Inst. Code, § 15610.30, subd. (b); *Paslay v. State Farm General Ins. Co.* (2016) 248 Cal.App.4th 639, 657 (*Paslay*).)

In *Stebley v. Litton Loan Servicing, LLP* (2011) 202 Cal.App.4th 522, the court held it was not "wrongful use" of property for a commercial lender to lend money, take collateral and foreclose on collateral when a debt is not paid. (*Id.* at p. 528.) "[A] lender does not engage in financial abuse of an elder by properly exercising its rights under a contract, even though that conduct is financially disadvantageous to an elder." (*Paslay, supra*, 248 Cal.App.4th at p. 657, citing *Stebley, supra*, at pp. 527-528.) By the same token, it is not wrongful use for an insurance company to accept the premium for an annuity, issue the annuity, and deduct the surrender charge specified in the terms of the annuity policy when the annuitant demands early surrender. There was no evidence that NWL, in accepting a premium and issuing an annuity or processing a surrender request and assessing a surrender charge, knew or should have known of Pantaleoni's fraudulent

35

conduct, i.e., that Pantaleoni had deceived Williams into applying for the first annuity when he only wanted a revision to a living trust and had Williams sign a blank document to use to forge letter of instruction directing NWL to reissue the second annuity after Williams cancelled the first one.

For the same reasons, this evidence did not show wrongful use by NWL within the meaning of the elder abuse statute. The elder abuse statute does not impose a duty to investigate even by a financial institution mandated to report suspected elder financial abuse to local law enforcement or adult protective services. (Welf. & Inst. Code, § 15630.1, subd. (e)(1) ["The mandated reporter of suspected financial abuse of an elder or dependent adult is not required to investigate any accusations"].) Much less does an insurance company, which is not a mandated reporter, have to duty investigate under the statute. (*Sterling Savings Bank v. Poulsen* (N.D.Cal. July 29, 2013, No. C-12-01454 EDL) 2013 WL 3945989, *17.) Mere suspicious circumstances do not show elder abuse. (*Das v. Bank of America, N.A.* (2010) 186 Cal.App.4th 727, 744-745 (*Das*) [" 'suspicious' " loans and transfers by elderly account holder did not state a claim for elder financial abuse against bank.])

Assuming NWL had monitored Pantaleoni as Williams suggested, there was no evidence showing that NWL knew or should have known of Pantaleoni's fraud. (*Das, supra*, 186 Cal.App.4th at p. 745.) For example, the evidence that the letter Williams signed stating that he wanted to retain the annuity was fraudulent or forged consisted of the difference between the handwriting on his note returning the first annuity and the handwriting above his signature on the letter. But no evidence was presented that NWL knew prior to the litigation that Williams, as he testified at trial, signed a blank piece of paper not knowing that Pantaleoni would fill in a request to reissue the annuity above his signature. That Williams wrote the note cancelling the first annuity and Pantaleoni apparently wrote the letter requesting that it be reissued for Williams' signature did not

36

suggest to NWL that the letter was forged.  There was no dispute that Williams' signature was genuine.

## C.    Motion for Judgment Notwithstanding the Verdict

NWL appealed from the judgment and the orders denying motions for judgment notwithstanding the verdict and new trial.  (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 [a party "may appeal from the judgment or from the order denying the motion for judgment notwithstanding the verdict, or both"]; Code Civ. Proc., § 904.1, subd. (a)(1), (4).)  NWL raised agency and wrongful use issues as grounds for judgment notwithstanding the verdict.  We conclude the trial court should have granted the motion for judgment notwithstanding the verdict.

" 'The purpose of a motion for judgment notwithstanding the verdict is not to afford a review of the jury's deliberation but to prevent a miscarriage of justice in those cases where the verdict is rendered without foundation.'  [Citation.]  'The scope of appellate review is to determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's conclusions . . . .'  [Citation.]"  (*Sukoff v. Lemkin* (1988) 202 Cal.App.3d 740, 743.)  Interpretation of a statute and applicable statutory language on undisputed facts is reviewed de novo.  (*Trujillo v. North County Transit District* (1998) 63 Cal.App.4th 280, 284.; see also *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 ["When the decisive facts are undisputed, we are confronted with a question of law and not bound by the findings of the trial court"].)  Denial of a motion for judgment notwithstanding the verdict rests largely in the discretion of the trial judge.  (*Sukoff, supra*, at p. 744.)  However, when the evidence fails to support an essential element of a cause of action, the judgment cannot stand.  (*Ibid.*)  Here, as discussed, the record failed to support the duty of care element of Williams' negligence claim and wrongful use required to support his elder financial abuse claim.

Therefore, we will reverse the judgment and direct the trial court to enter judgment in favor of NWL.  (Code Civ. Proc., § 629, subd. (c) ["If the motion for judgment

37

notwithstanding the verdict be denied and if a new trial is denied, the appellate court shall, if it appears that the motion for judgment notwithstanding the verdict should have been granted, order judgment to be so entered on appeal from the judgment or from the order denying the motion for judgment notwithstanding the verdict"].)

Because we reverse the judgment in favor of Williams, the remaining issues NWL raised on appeal, and the issues raised in Williams' cross-appeal, are moot.

## DISPOSITION

The judgment is reversed, and the case remanded to the trial court with directions to enter judgment in favor of NWL. NWL shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)


/s/
RAYE, P. J.

We concur:


/s/
ROBIE, J.


/s/
MURRAY, J.